The Chancellor.
This is an action of ejectment brought by, or on behalf of Catharine Neilson, formerly Catharine Duer, and one of the daughters of Lord Stirling.
It appears, by" the special verdict, that Lord Stirling was, on the 1st of January, 1771, seised in fee, of a tract of 3,000 acres of land in Wallkill, in the now county of Orange, and of which the premises in question are a part. That in that year, Ann Waddell recovered a judgment againt him, for 7,790/. of debt, and which judgment, upon the death of *570 Ann Waddell, was revived by scire facias, in 1775. That Lord Stirling died in 1783:/ and, in 1788, the executors of Ann Waddell. undertook po revive and enforce the judgment against the representatives of Lord Stirling. A scire facias was, accordingly, sued out of the Supreme Court in that year, directed to the sheriff of New-York, and commanding him to give notice to tlie heirs of Lord Stirling, and to the tenants of the lands in his bailiwick, which were bound by the judgment, to show cause, if any they had, why the debt should not be levied on those lands. To this writ ot scire facias the sheriff returned, (¡hat he had made known to Mary Watts and Catharine Duer, who were daughters and heiresses of Lord Stirling, to appear in the Supreme Court, and show cause, if any, why the debt should not be levied on those lands. The sheriff further returned, that there were no other heirs of Lord Stirling, nor any other ten,ants, or any lands in his bailiwick, bound by the judgment. The heirs did not appear according to the summons, but made default, and judgment was thereupon awarded, that the executors of Waddell should have execution against those heirs, of the lands which were of Lord Stirling, in 1771 j and in their hands and possession. In the same year, execution issued upon the judgment so revived, to the sheriff of Ulster, commanding him to levy the debt and costs of the lands in his bailiwick, whereof Lord' Stirling was seised, in 1771, and in the hands and possession of those heirs. The sheriff stated, that he bad seized certain lands which were of Lord Stirling, and of which he was seised in 1771, in the hands and possession of those heirs, and sold them to John Taylor. The premises in question were part of the lands so seized and sold, and John Taylor, in 1794, conveyed them to Samuel Harlow, who entered into possession, and in 1795, sold them to the father of the present defendant, who continued in possession from 1795 to 1814, when he died, and the estate descended to the defendant, as his son and heir at law.
From this state of facts, it appears that here has been an actual bona fide possession, under the sheriffs deed, of 25 years, and it is 31 years since Catharine Duer was personally summoned, as one of the heirs of Lord Stirling, to *571 show cause why the judgment debt against Lord Stirling should not be levied. The defence set up against this actio'n is twofold, and consists, 1. Of a title under the sheriff’s deed : 2. Of a legal protection under the statute of limitations. If this defence should prove ineffectual, then the lessor of the plaintiff, Catharine Neilson, as one of the daughters, and heirs of Lord Stirling, would be entitled to an undivided moiety of the premises. But she sets up a claim to the whole land, not as heir, but as devisee under her father. Lord Stirling, by his will, devised “ all his real and personal estate, whatsoever, unto his wife Sarah, to hold the same to her, her executors, administrators and assigns ; but in case of her death, without giving, devising, and bequeathing by will, or otherwise selling or assigning the said estate, or any part thereof, then he devised all such estate, or all such parts thereof as should so remain unsold, undevised or unbequeathed, unto his daughter Catharine Duer, to hold the same to her, her executors, administrators and assigns.” The claim, however, whether as heiress, or as devisee, is still under Lord Stirling, and subject to the judgment of Ann Waddell. In whatever shape Catharine Duer, now Catharine Neilson, may put forward her claim, she still is the very person who was personally summoned in 1788, to show cause why that judgment should not be levied, and who, by her silence and default, admitted she had nothing to say.
None of the facts in the case, are the subject of dispute. The existence and validity of the judgment debt, at the time of the scire facias, and of the sheriff’s sale, is not questioned. That the premises were owned by Lord Stirling, in 1771, and legally bound by the judgment, is not denied: (hat they were unoccupied in 1788, and that there was no actual tenant upon the land to summon, is granted. Neither the original judgment, nor the judgment upon the scire facias, nor the execution thereon, have ever been impeached, cither by a writ of error, or by application to the Supreme Court, on the ground of irregularity. They all stand, to this moment, and after a lapse of upwards of thirty years, as valid proceedings, upon record. The defence, therefore, in any view *572 of the case, is very imposing: and if, in the face of all these facts, the claim of the heir or devisee could be sustained in an action of ejectment, against the present defendant, should apprehend that it would communicate a very injurious insecurity to title under judgment and execution.
1. The first point to be considered is, whether the defendant has not a good title under the sheriff’s deed.
This point is supposed to have been once decided in this court in the case of Jackson v. Delancey, (13 Johns. Rep. 537.) which was argued and decided in the session of 1816. That was an action of ejectment brought by, or on behalf of, the claimant in the present suit, and under the same will, to recover lands lying in the town of Plattekill, in the county of Ulster. The defence set up was under the same judgment, execution, and sheriff’s deed to John Taylor, and it was contended, in that case, as well as in this, that the judgment was not duly revived by scire facias, because the widow of Lord Stirling was not made a party, and summoned ; and that the title under the sheriff’s deed was void, on that ground, and on the further ground, also, that the premises then in question were not described in the deed. It is to be observed that the lands sought to be recovered in that case, were no part of the 3,000 acres described in the sheriff’s deed, by metes and bounds, but they were sought to be included under the general description of “ all other the lands, tenements, and hereditaments and premises, in my bailiwick, whereof Lord Stirling was seised in 1771.” In the opinion which I had the honour to deliver before this court, and in the result of which the court unanimously concurred, it was stated that it appeared from the sheriff’s deed, that the levy, and exposure to sale, and the price bid, applied only to pieces or parcels of land which were therein mentioned and described, and that it was altogether inadmissible to sweep away all the rest of the defendant’s real estate in that loose undefined manner, when it was never specifically known or described, or set up at the sale. But as to the other objection to title under the sheriff’s deed, that the scire facias was not duly directed and served, I observed that “ Lady Stirling was the devisee of the real estate, and she was, consequently, the tenant of the freehold, and ought to have beeji *573 a party to the writ. It was the same thing, as to her rights, as if execution had issued, and the lands been sold, on the dormant judgment against Lord Stirling, without any revival by scire fa-cias. Still I take the law to be, that even the omission altogether of the scire facias will not, as of course, render void a sale under the execution. An execution issued on a judgment, after a year and a day, without revival, has been held to be voidable only, and a justification to thp ^party under it, until set aside. The scire facias is intended as notice to a party to show cause why execution should not, issue, and to give him an opportunity to plead payment, or other discharge; and if it be omitted in a case requiring it, he would, no doubt, be entitled to relief, on proper application. But in this case, the execution has been permitted to stand to this day, without being regularly questioned by Lady Stirling, or her representatives. - She lived seventeen years after the execution had been thus irregularly issued ; and it cannot but be presumed that the scire facias on her daughters came seasonably to her knowledge; and evén ten years have elapsed since her death, and no attempt appears to have been made by her heirs or deviseqs, to set it aside. 1 presume the Supreme Court would not now sustain a motion to set aside the execution for irregularity, after so great a lapse of time. The objection is infinitely stronger when the attempt is made to question the regularity of the execution, and to set aside the title under it, in this collateral action.” I then went on, in that opinion, to cite some authorities in confirmation of what I had said, and concluded the point, by observing, that “ the first objection to Taylors title under the execution, from the want of a regular revival of the judgment by scire facias, falls to the ground.”
I do not know that it ought to be considered that theSe observations, which I made in the cause of Jackson v. Delaney, necessarily received the sanction of the court, because the title under the sheriff’s deed was bad, on the other ground, for want of a due description and sale of the land, and because the defendant, in that case, was enabled to shelter himself under the protection of the mortgage given by Lord Stirling to Mrs. Waddell. It may be, that the other members of the. court were governed in their judgment by those other points *574 in the cause, because those points were sufficient to uphold the judgment in favour of the defendant. The Supreme Court, in the opinion which they gave in the cause now under review, seem to have cautiously avoided the express[on 0f any opinion on the title acquired by the sale to TayiQT' “Whether Taylor acquired a valid title, under the proceedings by scire facias and the sheriff’s sale, is a question,” say the court, “ which does not necessarily arise in this case.” The court, therefore, as if diffident of that point, place the validity of the defence in this case, entirely upon ' the statute of limitations. One of the judges says expressly, that “ were it not forShe decision of this court in Jackson v. Delancey, he should have no difficulty in saying, that the judgments were not well revived by scire facias against Lady Catharine Duer.”
As the Supreme Court have not assigned any reasons., or given us any authorities on this Very interesting point, touching the validity of the sale in 1788,1 am at a loss to know the • grounds of my error in that case. Out of deference to that court, as well as out of respect to the learned counsel who • have so ably argued this cause on the part of the plaintiff, I have reconsidered the point with all the care, and with all the research in my power, and I am under the necessity of saying, that I remain of opinion, that the title under the sheriff’s deed is valid in law. I prefer placing the cause on that ground rather than on the statute of limitations, because I am unwilling to cast even the shade of suspicion over such a title. I cannot give countenance to the idea, that Mrs. Duer can be personally summoned in 1788, as one of the heirs of Lord Stirling, and can suffer a judgment to pass by default on the scire facias, and large tracts of uncultivated land to be sold and settled under it, and now, after the lapse of thirty years, can be permitted to come into court, upon the ground that we mistook her claim and title to the land. It is not sufficient to say, that she did not claim it as heir of Lord Stirling, though the creditor may have supposed it; and that her claim was under the will of Lord Stirling, by way of executory devise, after a life estate in her mother. I should think it would be a sufficient answer to such an allegation, to say, *575 that she had an interest in that land which was bound by the judgment, and liable to be sold on execution; and that if she had any thing to say against an execution, or that all proper parties were not summoned, she should have appear-, ed and pleaded it.
It is not pretended, now, that the judgment debt was not fully and fairly due, or that there was any person ready, at that time, to discharge it. If the scire facias had been in any other form, and under any other direction, the result would have been the same. There were no persons then living to whom the scire facias could have been awarded, except Lady Stirling and her two daughters. We are well warranted to presume, that neither of them had any thing to say that could have impeded the creditor’s remedy. The whole objection, therefore, to the informality of the scire facias, on the part of Mrs. Neilson, is matter of form, and not of substance. The creditor had no concern with any thing that Lord Stirling had done by will, to entangle his title with life estates, contingent remainders, executory devises or other family interests. The creditor had a right to sell the land, upon the revival of the judgment, and to vesta good title in the purchaser, which would be paramount to these subsequent claims, and demolish, at once, all these mysterious and complicated settlements.
There does not appear to be any intrinsic merit in the claim, and I think it can be satisfactorily shown to he precluded by the rules of law.
In the first place, the better opinion is, that if execution had been issued without any scire facias, the sale under it would not have been void. It might have been voidable, and liable to have been set aside, by the Supreme Court, upon motion, as irregular, or by this court, upon error, as erroneous ; but until that was done, the title would have stood. This question of irregularity, or error, never can be discussed collaterally in another suit. It is not a point in issue in this action of ejectment. We are only to look to the judgment, and cannot question its regularity. Thus, in the case of Patrick v. Johnson, (3 Lev. 403. 2 Lutw. 925.) an action was brought for false imprisonment, and the defendant justified under a judgment of the 1st year of William
*576 and Mary, and a ca.'sa. of th'e 4th of William and Mary. To this plea the plaintiff replied, that the execution had issued after a year and a day from the judgment, without being revived by scire facias ; and on demurrer, the court resolved, that the execution sued after the year, was not void, but only voidable by writ of error; and until it be reversed, it is a good justification. This case was decided in the C. B., as early as the 6th of William and Mary, and it has since been quoted in all the books, and received as good law. Now, if a ca. sa. issued after a year and a day, without being revived by scire facias, will justify the sheriff in taking the body of a defendant, it will equally justify the sheriff in selling his land; and the purchaser may justify under such a title, at least until the judgment and ^execution be set aside for irregularity, or reversed by writ of error. It appears to me that the conclusion from this authority is irresistible. The same doctrine is taught in many other cases. Thus in Burke’s case, (Cro. Eliz. 188.) and Shirley v. Wright, (1 Salk. 273.) and Marlin v. Ridge, (Barnes, 206.) a sheriff suffered a prisoner to escape on ca. sa. issued after a year and a day, without a scire facias ; and it was held that he was liable, and could not take advantage of the want of the scire facias, because the execution was good until set aside. The process was only erroneous, and not void. The Supreme Court of this state have uniformly regarded this as a settled rule of law. In the case of Reynolds v. Corp Douglas's, (3 Caines, 267.) decided in 1805, the court all agreed in the validity of an execution issued after a year and a day, without revival, but they admitted that it was liable to be reversed, as erroneous. So also, in Jackson v. Bartlett, decided in 1811, (8 Johns. Rep. 361.) there was an ejectment against a purchaser of land under a sheriff’s sale, and the regularity of the execution was questioned, because it issued after a year and a day, without a revival of the judgment by scire facias. The court say, that the question on the regularity of the fi.fa. could not be raised in the action of ejectment; and that though it may have issued a year and a day after judgment, without revival, it was only voidable at the instance of the •party against whom it issued. The purchaser’s title could *577 not be questioned in that collateral action under such an execution. It was a good authority for the sale.
All these cases are much stronger than the present, for the execution in each of them was upon a dormant judg* ment, without the issuing of any scire facias.
But it is said, that these were cases of executions issued after a year and a day, and not after the death of the party. I do not know, however, that such a circumstance makes any difference in the application of the rule. The presumption that the judgment is satisfied, is no stronger when the parties to the record are changed by death, than when the creditor has suffered the judgment to sleep. But in the Pennsylvania case, of the Lessee of Heister v. Fortner, (2 Binney, 40.) a judgment was obtained in 1789, by A. against B., and some years afterwards, A. died, and his executors issued execution on the judgment in 1797, after a scire facias issued, and one nihil only returned, which was as no summons, either in law and fact, and sold the land. The court held, that the judgment and execution on such a scire facias might be set aside for irregularity, or reversed on error, but that neither the error, nor the irregularity, could be noticed in that ejectment suit against the purchaser. Here, then, we have the same doctrine, when one of the parties was changed by death, and it shows, that there is in such a case no variation in the principle.
But I need not pursue this point any farther, for a scire facias did actually issue in this case, and the heirs of Lord S., (and one of them was the present lessor of the plaintiff,) was actually summoned to appear and show cause, and they omitted to do either.
There were no terre-tenants or actual occupiers of the land to summon. It is admitted, that Samuel Harlow made the first entry upon the premises in 1794. There were no persons to summon, but the widow and children of Lord Stirling; if the former was not made a party to the scire facias, the heirs did not come forward and object to -it, and the rights of the widow we are not now to discuss. If she had only a life interest, as the counsel for the plaintiff contend, that interest terminated with her life. Placing the interest of Lady Stirling, then, for the present, out *578 of view, there were no persons to summon but the two daughters, and being personally summoned, can they now be heard to object to any informality in the process ? How absurd would it have been to have issued a scire facias to the sheriff of Ulster, when the. heirs lived in New-York, an5 when there were no occupants upon the land. The scire facias was directed to the sheriff of New-York, to summon the heirs and the tenants of the lands in his bailiwick, and he returned that he had summoned the heirs, and that there were no other heirs, and that there were no other tenants. In the absence of all actual occupiers, the rightful owner is the terre-tenant, and if he owns only a remainder in fee expectant on an estate for life, (as is contended for on behalf of Mrs. Neilson,) he is the terre-tenant of the fee. In England, the heir who has only such an estate in remainder may plead it to the scirefacias, and allow the creditor to take judgment -for assets, quando acciderunt. But not so here, for the judgment existing prior to the creation of these separate interests, is to be presently satisfied without regard to them. Indeed it is held in England, that a reversion expectant upon an estate for life, is assets in the' hands of the heir. (1 Lord Raym. 53. Carth. 129. Holt, Ch. J. Kellon v. Rowden.) The judgment upon the scire facias was, that the party should have execution of the lands whereof Lord Stirling was seized in 1771, “ being in the hands and possession” of those heirs. The judgment was not confined to the lands in the city of New-York. It was co-extensive with the jurisdiction of the court, and reached to all the lands of Lord Stirling throughout the state. How, otherwise, was the creditor to award his scire facias, except against the heirs, when the land was unoccupied? There is no evidence in the case, that the will of Lord Stirling was then made public, or known to the party. It was the business of the heirs to have come in and pleaded that there were other parties in interest not summoned, if they deemed it material to have their mother, or any other person, associated with them in the writ. But the fact is, that it was not material, andwhoever may have been summoned, no doubt the execution must have been awarded, for no person appears to have been ready and able to pay the debt.
*579 It is no defence for Mrs. Neilson to say, that her interest in the land was in the character of a devisee, and not in that of heir. She was summoned as heir and as tenant, and the sheriff returned, that he had summoned her and her sister, and that there were no other heirs, nor any “ other tenants.” The scire facias was to summon the heirs and the tenants, and the return of the sheriff upon a just construction of it, is, that he had summoned her, in both capacities. Her character as terre-tenant would apply as well to her as devisee, as heir.
These criticisms are, however, unnecessary. After such a lapse of time, and in such a collateral way, a scire facias and its return, are not to be assailed by such means. There is no precedent for it in law, nor any colour for it in justice. By suffering judgment to pass by default upon the scire facias, all the rights of the lessor of the plaintiff, as heir of Lord Stirling, and as devisee of Lord Stirling, were waived and abandoned.
Though Mrs. Duer was, at the time, a feme covert, and her husband was not returned by the sheriff, as summoned with her, the objection, if good at all, should have been pleaded in abatement. (Lord Kenyon, and theK. B. in 3 Term Rep. 631. Com. Dig. tit. Abatement, F. 2. tit. Pleader, 2. A. 1.) It was cured by the default, and, at most, was but matter of error.
In Hannon v. Mase, (Hob. 283 ) a defendant to a scire facias upon a judgment, was summoned, and made default, and execution was awarded against him. He had a release of the judgment which he had neglected to plead, and he was held concluded by the default, and relief was denied him. So, in Bascock v. Thompson, (Sty. Rep. 281. 288.) error was brought by special bail to reverse a judgment upon scire facias by default, and the error alleged was, that no ca. sa. had been previously taken out against the principal, and, therefore, the scire facias against the bail was not good. Roll, Ch. J. admitted, that this would have been a good plea to the scire facias; but as the party had been duly-summoned, it was too late then to use it for error, for otherwise, there would be no end of things ; and the judgment ■was affirmed.
*580 These two cases are of ancient date, and they show, that the party may effectually, waive his rights, by suffering a defau*t uPon the scire facias, even though he may have the most pressing equity in his favour. And can the present lessor of the plaintiff expect to be relieved at this day, and in this action, when she does not show that she had then, or ever had since, any thing to plead to the scire facias? But I proceed to stronger and graver cases.
The case of Gilburn v. Rack, (2 Sid. 7. and 12.— 1 Lord Raym. 590. S. C.) was decided in the year 1657, in what was called the upper bench, during the transitory period of the English commonwealth. This case cannot but be received here with some interest and curiosity, for it was the decision of a republican tribunal sitting in Westminster Hall. There was a judgment against A. B. and C. A?, one of the defendants, died, and the scire facias issued against his heirs, and it misrecited one of the parties to the judgment. The sheriff summoned the heir, and a judgment was given, and execution by elegit issued. The tenant by the elegit brought an ejectment against the heir, and the special verdict found these facts, and that the defendant, who died, was seised in tail, and that the scire facias was against the heir and terre-tenant, and the heir in tail was warned, and returned by the sheriff as heir in fee, and judgment was taken against him by default, and the entailed lands taken in execution. And what did the court say to such a weighty defence as this, which was, that the scire facias misrecited the judgment, and that his lands ought not to be charged in execution as if he was tenant in fee, when in truth he was only tenant in tail ? The answer of the court was, that he was estopped by the summons upon the scire facias, and the default, to give in evidence, that he was tenant in tail, and not tenant in fee, for he should have appeared, and pleaded to the scire facias. Nor would the court take notice of the misrecital of the judgment ; and they said that they would intend a judgment that would warrant the execution.
This case was cited, long afterwards, by Lord Ch. J. Holt, (1 Lord Raym. 590.) and then again by Ch. J. Eyre, (Str. 732.) as good law.
*581 The next case of similar import, was that of Day v. Guilford, (T. Raym. 19. 1 Sid. 54. 1 Lev. 41. 1 Keb. 112. 141. S. C.) decided in the K. B. in the 13 Car. II. immediately after the restoration ; and though the judges were now clothed with royal ermines, the two cases show, that the principles of law are not to be affected by the revolutions of government. In this case, it was found, by special verdict, that the father of the defendant was seised of the lands in question, for life, remainder to the defendant in tai!, and the father acknowledged a debt of record to the plaintiff, and died. The plaintiff then sued out a scire facias upon the debt of record, against the defendant, as heir, and the sheriff returned the defendant as heir, and terretenant, and that he had summoned him. He made default, and did not plead, and judgment and execution were rendered for the plaintiff, who brought ejectment. The preceding case of Gilburn v. Rack was cited by the counsel, and the court held, that the defendant was bound by the judgment by default, upon the scire facias, for he ought to have ap peared, andpleaded, and that he could not be relieved, nor falsify the recovery in that action of ejectment. It was his folly not to have appeared when warned. And judgment was rendered for the plaintiff, though it was admitted, that the recognizance by the father, who was only tenant for life, was no lien on the lands of the defendant, because the estate of the heir in tail was not liable to the judgment against the father. If the party will not come in, and plead to the scire facias, though he be a mere stranger, and in of another estate, as the issue in tail, after a tenant for life, he is estopped, and shall never falsify the judgment. Leges vigilantibus non dormientibus subveniunt.
This was a very strong case. It went even beyond that which was pronounced in the time of the republic. Nei< ther of them have ever been overruled, or questioned : and now permit me to ask, where is the ground for distrust in the opinion, or for imputed error in the doctrine on this point as delivered in this court three years ago ? Catharine Neilson, with all her claims under the will of Lord Stirling, (whatever they may be,) is bound, and concluded by the judgment by default, against her upon the scire fa;. *582 das ; and the subsequent execution and sale to Taylor were valid in law, and are not now to be shaken. Such a doctrine as this, 1 cannot but think, to be the true and sound doctrine of the common law, for it gives stability to legal proceedings, and security to judicial sales, and quiet to purchasers, and confers a signal blessing upon the community.
The title under the judgment on the scire facias is not only exempt from impeachment in this action, but it cannot be touched any where, or in any action. No writ of error will now lie, and no motion for irregularity can now be made. They are both barred by time, and were so long before the commencement of this suit. And I should doubt whether either of them, in this case, could have been sustained, at any time, on behalf of the heirs, so as to defeat the sale and purchase under the execution. There is much good sense and sound policy in the doctrine of Lord Ch. Redesdale, on this point, as delivered by him in the case of Bennett v. Hamill. (2 Sch. fy Lef. 566.) A man died leaving a widow and an infant son; and his judgment creditors, in collusion, as was supposed, with the widow, filed a bill in Chancery to have the infant’s estate sold, and the widow appeared for herself and as guardian for her infant son, and a decree of sale was obtained. Under that decree, certain freehold and leasehold premises were sold, which came by purchase, fora valuable consideration, to the defendant who expended large sums in improvements. When the infant came of age, he filed his bill to set aside the decree and sale under it, as irregular and erroneous, and one ground of the allegation was, that he had no day given him by the decree, after he came of age, to show cause against it. Thé Chancellor admitted that there were irregularities in the proceedings which he pointed out, and that the decree was erroneous, inasmuch as the infant ought to have had a day to show cause against the decree when he came of age. But he held that this was not to affect the purchaser’s title. It would be too much, he thought, to say, that a purchaser under a decree of that description could be bound to look into all these circumstances, and go through all the proceedings from the beginning to the end. The general impres- ' sion from the cases was, that a purchaser had a right to pre *583 sume that the court had taken the necessary steps, and he was only to see that all proper parties to be bound were before the court, and that the title was one affected by the decree. If we went beyond this, he observes, we should introduce doubts on sales under the authority of the court, which would be highly mischievous.
If I am correct on this branch of the defence, it would be unnecessary to go farther. The judgment of the Supreme Court must be affirmed. But, perhaps, my opinion may not meet with the entire concurrence of the court, on this point; and as the other head of the defence arising upon the statute of limitations, occupied the largest and most intricate part of the argument of the counsel, I should not feel satisfied with myself, if I did not pay some attention to so learned a discussion.
If Lady Stirling took an estate in fee under the will of Lord Stirling, then at her death, Mrs. Neilson would have been entitled, as one of her heirs, to an equal undivided moiety of all her interest in the premises. But if Lady Stirling took a fee, then an adverse possession commenced, when Harlow entered into possesion under John Taylor, in 1794, and the statute of limitations began to run against her, for she was then under no disability. When the statute once begins to run, it continues to run until the twenty years have expired, and, therefore, not only Lady Stirling, but all who claim under her by will or by inheritance, were bound in 1814, and before (he commencement of this suit. The question, therefore, as to what estate Lady Stirling took under the will, becomes material only by its influence upon this other question of the statute of limitations; and it was quite entertaining to see how industriously and profoundly the counsel were obliged to labour upon the one question merely to bring it to bear upon the other.
This question is also supposed to have been decided by this court in the former cause of Jackson v. Delancy. But, I apprehend, that the decision of this court in that case does not rest at all upon this point, and I barely mentioned in the opinion which I then delivered, that Lady Stirling did take a fee under Lord Stirling's will, and that the devise aver to his daughter Catharine Duer, was not a good limitá *584 tion by way of executory devise. I relied for this upon the decision of the Supreme Court in Jackson v. Bull, (10 Johns. Rep. 19.) and observed, that nothing had been urged to show why that decision was not to be regarded as correct. It is that decision, then, and not the one in this court) which I think governs this question. If that decision be sound, then, according to the principle of it, Lady Stirling did take an estate in fee; and, notwithstanding all that has been said or suggested to the contrary in the court below, (Vide 15 Johns. Rep. 171, 172.) I am obliged still to be of the opinion, that it was a well-founded decision.
Suffer me, for one moment, to re-examine its foundations. Redit labor actus in orbem.
The testator, in that case, devised to his son Moses, and to his heirs and assigns forever, a lot of land, and then added, that in case his son should die without lawful issue, the property he died possessed of, he gave to his son Young. Moses, the son, did die in possession of the property, and without lawful issue, but he devised it by will, to his- wife and others, under whom the plaintiff claimed, in opposition to the devise over'to the other son.
The counsel for the plaintiff, contended, that the limitation over by way of executory devise, was void, because repugnant to the absolute power of disposal given by the will to Moses,who was thereby enabled to defeat it. The court unanimously acceded to that principle, and cited authorities in support of it, and gave judgment for the plaintiff.
The first case that the court then relied upon, was that of The Attorney General v. Hall, (Fitzg. 314.) decided in 1731, by Lord Chancellor King, assisted by the master of the rolls, and Chief Baron Reynolds. Hall, the testator, owning real and personal estate, gave it, by will, to his son, and to the heirs of his body, and if he should die, leaving no heirs, then he gave so much of the real and personal estate as his son should be possessed of at his death, to the Goldsmith"1 s Company at London, for charitable purposes. A limitation over for such a purpose had strong claims upon the protection of a court of Chancery, and I hope that I may be excused for making, as a passing remark, *585 that the will awakens interesting associations from another circumstance, which is, that Sir Isaac Newton was one of the executors. The son alienated the real estate by a common recovery, and bequeathed the personal estate by will to his wife, and died without issue. The question arose between the wife, claiming under the will, and the Goldsmith’s Company claiming by virtue of the limitation over on the event of the son, dying without issue. The case was fully and ably argued, and there was no distinction made between the real and the personal estate, as to the validity of the limitation over. The court were unanimously of the opinion, that the Goldsmith’s Company had no valid claim, and that the limitation over was void, because the absolute ownership - had been given to the son; for the property was given to him and the heirs of his body, and the company were to have no more than he should leave unspent, and, therefore, he had a power to dispose of the whole. The words that gave him an estate tail in the land, gave him the entire property in the personal estate, and nothing remained to be given over by the testator.
The point of that case then was, that where an estate is given to a man, and the heirs of his body, with a power of disposal, at his own will and pleasure, it carries with it an absolute ownership, repugnant to any limitation over, and destructive of it. The court did not make any distinction between the real and personal estate, and say, that the limitation over was good as to the one, and void as to the other. They said, generally, that the limitation over in the will was void, because the testator gave the son an unqualified power to spend the whole.
The other case that the court relied on in Jackson v. Bull, was Ide v. Ide, (5 Mass. Rep. 500.) decided in the Supreme Court of Massachusetts, in 1805. There the testator gave by will, to his son, and to his heirs and assigns forever, certain real and personal estate, and then added, that if the son died without heirs, the estate which he should leave was to be equally divided between two other persons. The son did die without leaving heirs, and the question arose between those claiming the real estate under the limitation over, and those claiming it under a conveyance from the son. The *586 opinion of the court was delivered by the late Ch. J. Parsons'-, wh°se character, as a lawyer and a judge, is held in universal reverence. He cited and relied upon the case of The Attorney General v. Hall, and said, that “ whenever it is the c^ear intention of the testator that the devisee should have an absolute property in ihe estate devised, a limitation must be void, because it is inconsistent with the absolute property supposed in the first devisee. And a right in the first devisee to dispose of the estate devised, at his pleasure, and not a mere power of specifying who may take, amounts to an unqualified gift.” He then applied the rule to the case before him, and observed, that “ the absolute unqualified interest in the estate devised, was given to the son, which was inconsistent with the limitation over, and, consequently, the limitation was void.”
The error, in the case of Jackson v. Bull, said the learned counsel, was in applying the English case to the real estate, when it was applicable only to chattels. But the Supreme Court of Massachusetts were then in the same error, for they equally so applied it. n The limitation over,” says Chief Justice Parsons, “ makes no distinction between the real and personal estate, operating only on such part of either, as the first devisee should leave.” In both of those cases, the devise was of real and personal estate in the same sentence, and the same limitation over was created as to each ; and neither the English, nor the 'Massachusetts court, " admitted any difference in the rule of construction, or in the operation of the power of alienation, whether applied to the limitation of the real or of the personal estate.
I do not know that either of those two last decisions have ever been questioned in any court, or by any author. They were pronounced by the highest judicial authorities; and Lord Hardwicke, (1 Ves. 10.) gives his sanction to the accuracy of the English case. Beachcroft v. Broome, (4 Term, 441.) decided in the K. B. in 1791, is in confirmation of the doctrine of the prior case. That was the case of a devise to B. and his heirs, and if he die without having settled, or otherwise disposed of the estate, or without leaving issue of his body, then the devise over. B. sold the premises in fee, and died without issue, and the question was, whether the *587 purchaser took an estate in fee, and the K. B. held clearly that he did. The decision is entirely conformable to the doctrine in the Attorney General v. Hall, and Ide v. Ide, and Jackson v. Bull; but a'single expression of Lord Kenyon is seized upon, and great reliance was placed upon it by the counsel for the plaintiff in this cause. Lord Kenyon said, (and it must have been in loose conversation on the bench,) that if the case had turned on the question whether that was an estate tail in B., he should have thought it extremely clear that on failure of the first limitation, the second ought to have taken effect as an executory devise. Perhaps, the meaning of Lord Kenyon is not to be clearly understood, It was an observation not required by the decision, nor applicable to the point; but let it mean what it may, are we to permit such a loose remark to be of any weight or consideration, in opposition to the deliberate and solemn judgments of the courts ? It is enough, I apprehend, merely to mention such a dictum, and then to pass it by in silence.
If we now apply these teases to the will of Lord Stirling, we cannot but be struck with their perfect and controlling application. He does, in the first place, devise and bequeath unto his wife Sarah, all his real and personal estate whatsoever, to hold the same to her, her executors, administrators and assigns. This was a gift in fee. The word estate, in a will, carries the land and all the testator’s interest in it. It is genus generalissimum, said Lord Holt, (Countess of Bridgwater v. Duke of Bolton, 1 Salk. 236.) and includes all things real and personal. The words all his estate are, in a will, descriptive of his fee; and in a subsequent case, (Barry v. Edgworth, 2 P. Wms. 523.) the Master of the Rolls, referring to this opinion of Holt, said, that the law was then settled on the point, and that the word estate comprehended not only the thing, but the interest in it; and as it had been agreed and settled to convey a fee in a will, it would be dangerous to refine upon it. So again, Lord Mansfield observed, (Roe v. Harvey, 5 Burr. 2638.) that the word estate in a will, carried every thing, unless tied down by particular expressions. And in a subsequent *588 case, (Holdfast v. Marten, 1 Term Rep. 411.) Mr. J. Buller said, that the word estate was the most general word that cou^ be used, and words of restraint must be added to make it carry less than a fee. And lastly, (for I will not fatigue myself with further citations on the point,) Mr. J. Patterson* of the Supreme Court of the United States, declared, (3 Cranch, 134.) that the word estate was the most general, significant, and operative word, that can be used in a will; and it comprehends both the land and the inheritance.
We may say, then, that Lord Stirling, by the first part of his will, gave an estate in fee to his wife. So he, also, repeated this gift of a fee, by the next clause in the will, when he admits expressly, that she has the power and the right to give, devise, and bequeath, or sell or assign the estate, or any part thereof. This power, of itself, is an attribute of ownership, and carries with it a fee. Thus, as early as 6 Eliz (Dalison’s Rep. 58.) it was held by the judges, that if a man devises land to his wife, to dispose of and employ it upon herself and her son, at her pleasure, she takes a fee. So again, Lord Coke says, (Co. Litt. 9. 6.) that if a toan de- , vises land to another, to give and to sell; this amounts to a devise in fee; for, in a will, the word heirs is not necessary to create an estate of inheritance. There are many other eases to the same effect, which I need not particularly mention, (Moor, 57. 2 Atk. 102. 2 Johns. Rep. 391.) and we may lay it down as an incontrovertible rule, that where an estate is given to a person generally, or indefinitely, with a power of disposition, it carries a fee $ and the only exception to the rule is, where the testator gives to the first taker an estate for life only, by certain and express words, and annexes to it a power of disposal. In that particular and special case, the devisee for life will not take an estate in fee, nbtwithstanding the distinct and naked gift of a power of disposition of the reversion. This distinction is carefully marked and settled in the cases. (Tomlinson v. Dighton, 1 Salk. 239. 1 P. Wms. 149. S. C. Crossling v. Crossling, 2 Cox, 396. Reid v. Shergold, 10 Ves. 370. Goodtitle v. Otway, 2 Wils. 6.)
The question then occurs, was the limitation over to Mjs* Buer valid, after the creation of such an estate in fep;
*589 The words of the will were, that “ in case of the death of his wife, without giving, devising, and bequeathing by will, or otherwise selling or assigning the estate, or any part thereof, he doth give and devise all such estate as should so ' o remain unsold, undevised, or unbequéathed to his daughter, Lady Catharine Duer,’ &c. This limitation over, must be either as a remainder, or as an executory devise, and it is impossible that it should be either, upon any known principles of law. No remainder can be limited after an estate in fee, and, therefore, if a devise be to A. and his heirs, and if he die without heirs, then to B., the remainder is repugnant to the estate in fee, and void. (Preston v. Funnell, Wittes' Rep. 164. Pells v. Brown, 2d point, Cro. Jac. 590.) Nor can the limitation over operate by way of ex-ecutory devise, because the power to dispose of the estate by will or deed, which Lord Stirling gave to his wife, is fatal to the existence of that species of interest. It is a clear? and settled rule of law, that an executory devise cannot be prevented or defeated by any alteration of the estate out of which, or after which, it is limited, or by any mode of conveyance. It cannot be created, and it cannot live under such a power in the first taker. “ These limitations,” says Mr. J. Powell, (Scatlerwood v. Edge, 1 Salk. 229.) “ make estates unalienable, for every executory devise is a perpetuity, as far as it goes, that is to say, it is an estate unalienable, though all mankind join in the conveyance.” (Vide also, 2 Fearne, p. 51. by Powell. 2 Saund. 388. d. note.) We are obliged, therefore, to have recourse to thq explicit and settled doctrine, in the cases of The Attorney General y. Hall, and of Ide v. Ide, and of Jackson v. Bull, and say, that an absolute ownership or capacity to sell, in the first taker, and a vested right by way of executory devise in an. other, which cannot be affected by such alienation, are perfectly incompatible estates, and repugnant to each other, and the latter is to be rejected as void.
Lord Stirling clearly intended to give his wife an estate in fee. The words amount to demonstration of that intention. If she sold the land-, she was not accountable for the proceeds. She could not be chargeable with waste, and she might mortgage, or incumber the land, for that is in- *590 eluded in the right to give, and sell, and assign. And when he attempted to ingraft an executory devise or limitation over> upon a fee with such an absolute power of control, he did what was incompatible with his other and principal intention, and which the courts must, of necessity, reject as repugnant and void.
There is not a case to be found, in which a valid executory devise was held to subsist under an absolute power of alienation in the first taker. I have looked at the cases so industriously collected by the plaintiff’s counsel, and there are none of them that reach this point. All executory devises may be said, in some degrée, to depend upon the will or discretion of the owner of the precedent estate. If a devise be to A. in fee, but if he die without issue living at his death, then over to B., it is in his volition and power, (morally speaking,) not to marry, or to marry, and have issue, and so avoid the devise over. So, if ¡the limitation over be made to depend upon the contingency, that the first taker' marry without the consent of B., or marry a prohibited person, he may, undoubtedly, avoid marrying without the requisite ‘ consent, or avoid marrying against the prohibition, ■and só defeat the limitation. But these distinctions have nothing to do with the simplicity and good sense of the general rule we are discussing. The first taker, in these special cases, has not an absolute discretion and free agency, within the meaning of the rule. The sound doctrine on the subject is, that an executory devise under the salutary checks provided for it, is a stable and unalienable interest, and the first taker has only the use of the land or chattel, pending the contingency mentioned in the will j and he cannot convert the property to his own use, and defeat the subsequent estate by a voluntary alienation. This is the rule for which we contend, and it was not so with Lady Stirling. She could give and devise, and she could sell and assign the estate when, and to whom, and for what purpose she pleased. She was a free moral agent, and an absolute and independ- • ent owner, in respect to the estate. This is what we understand by a right, incompatible with an executory devise, and this is what we are to understand by the books, when they *591 speak of a limitation over as being void, because inconsistent with such an absolute power and dominion in fee.
But it is time that this discussion should draw to a close, The result of my inquiry, is a belief, that the defendant has a good title under the judgment and execution, and that if he had not, he is, nevertheless, protected by the statute of limitations, because Lady Stirling was seised in fee, so as to enable the statute to run against her, when the adverse possesion commenced, in 1794. Upon either ground, if cor. rect, the judgment must be affirmed. During the examination of this subject, I have not been insensible to the weight of the inquiry, and more especially, as' one of the judges of the court below seems to think the law in favour of the claim. The counsel for the plaintiff, and one of them a son of a lessor of the plaintiff, have, indeed, laboured the points, in their argument annexed to the case, as well as at this bar, with a diligence and painful anxiety, and, no doubt, with a sincere conviction, that has excited my sympathy. The descendants of Lord Stirling appear to feel, that a rich inheritance has been injuriously snatched from their enjoyment, but I think it was fairly lost by the inability or neglect of their ancestor, or his representatives, to redeem the incumbrance. And if the law was with the plaintiff, would not our sympathies be as properly directed to this defendant, whose father was a bona fide purchaser under the execution, and cultivated the premises as his own for 20 years, and died in possession, and transmitted the fruit of his labour to his son ? The truth is, that judges are bound to declare the rules of law strictly, without regard to consequences. They must follow the conclusions of the understanding, and not the dictates of the heart. If the argument on the part of the plaintiff has made a more favourable impression upon others than it has upon me, I shall be perfectly contented. I am, however, obliged to say, as the case strikes me, that the law is with the defendant, and that the judgment ought to be affirmed.
This being the unanimous opinion of the court, it was, thereupon, ordered, adjudged and decreed, that the judgment of the Supreme Court be affirmed, and that the plain *592 tiffs in error pay to the defendant in error, fifty dollars and fifteen cents, for his costs and charges, in and about his defence in this court; and that the record be remitted, &c.
Judgment of affirmance.